1  KENDALL BRILL & KELLY LLP
   Richard B. Kendall (90072)
2    *rkendall@kbkfirm.com*
   Patrick J. Somers (318766)
3    *psomers@kbkfirm.com*
   Nicholas F. Daum (236155)
4    *ndaum@kbkfirm.com*
5  10100 Santa Monica Blvd., Suite 1725
   Los Angeles, California 90067
6  Telephone: 310.556.2700
   Facsimile:  310.556.2705
7

8  Attorneys for Plaintiff Creative Artists Agency, LLC

9              **UNITED STATES DISTRICT COURT**

10    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12

13  CREATIVE ARTISTS AGENCY, LLC,

14              Plaintiff,

15       v.

16

17  WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,

18

19              Defendants.

| | |
|---|---|
| Case No. 2:19-cv-5701 | |
| **COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT** | |
| **JURY TRIAL DEMANDED** | |

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

# I.   STATEMENT OF THE CASE

1.     This lawsuit is necessary because the leadership of a labor union is attempting to restrain competition on a staggering scale using illegal means, including agreements with non-labor parties in service of a group boycott and overly restrictive restraints in commercial markets that the union has no authority to regulate, all of which is prohibited by law.

2.     Defendants Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE") (collectively, "the WGA") form the labor union that is the exclusive collective bargaining representative for writers in the entertainment industry.  Plaintiff Creative Artists Agency, LLC ("CAA") is a talent agency licensed under California and New York law to procure and negotiate terms of employment for artists working in the entertainment industry, including writers who are WGA members.

3.     The WGA has organized a group boycott and unlawful restraint of trade targeting CAA and other talent agencies.  The group boycott is, as the WGA's leadership has freely acknowledged, a "power grab."  In outline, the WGA's illegal group boycott works as follows:  The WGA instructed its members to refuse to deal with CAA and other talent agencies unless CAA and other talent agencies accept a "Code of Conduct" requiring the agencies, among other things, to absolutely, categorically, and without exception cease and withdraw from (a) the decades-long practice of "packaging" arrangements and (b) any affiliation with or investment in any entity that produces or distributes content ("affiliated production").  If the WGA's members do not follow the WGA's instructions to refuse to deal with agencies that reject the "Code of Conduct," the members face sanctions, up to and including expulsion from the union, effectively a death sentence for a writer's (or writer-producer's) career.  As a result, most WGA members (even those opposed to the WGA's actions) have fired their agents, including agents at CAA.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4.     The WGA has conspired with and induced non-labor groups—including producers, and non-licensed managers and attorneys—to join and/or aid and abet the group boycott.  It has also tried to coerce the employers with whom the WGA has a collective bargaining agreement, including the major television production studios, to do the same.

5.     One purpose of the boycott is to restrain the agencies from engaging in the commercial activity commonly known as television packaging.  A second purpose is to restrain the agencies from investing in or affiliating with content producers and distributors who seek to serve currently underserved market segments.  In effect, the WGA is seeking to restrain competition in a significant portion of the entertainment industry, far beyond lawful union interests.  The WGA's unlawful group boycott ultimately will cause substantial harm not only to talent agents but also to actors, directors, production staff, below-the-line employees, and many other industry workers—as well as the vast majority of the union's own writer membership—all of whom depend on the agencies' pro-competitive activities to ensure that television shows actually get made and that individual artists are equipped to maximize their value.

6.     Federal antitrust law prohibits agreements that unreasonably restrict competition.  In some circumstances, labor union activity has a limited exemption from the law of antitrust, because a limited exemption from antitrust law is necessary for the ordinary activity of labor unions, i.e., collective bargaining in a particular labor market.  But this boycott is not ordinary labor union activity.  The WGA's group boycott exceeds—vastly—any exemption from the antitrust laws that the WGA may have for its ordinary activities as a labor union.  Here, the WGA is trying to coerce anticompetitive agreements in order to severely restrict competition in markets far beyond anything the WGA might have a lawful labor union or collective-bargaining interest in restraining.  Because the WGA's group boycott oversteps the WGA's legitimate and lawful union interests, and because the WGA is

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

3

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

orchestrating and attempting to orchestrate the group boycott and unlawful product restrictions in concert with many non-labor actors, the WGA is in violation of the antitrust laws.

7.    ***Agency packaging.***    Since the 1950s—and, for more than 42 years before April 2019, with the express contractual permission of the WGA—talent agencies such as CAA have brought together some or all of the key creative talent and intellectual property for certain television programs.  This practice is known as "packaging."   Each "packaged" deal is different and the deals are highly idiosyncratic depending on a particular deal and particular agency.  But in broad terms, "packaging" occurs when an agency presents to a studio one or more of the key creative elements for a television production, such as writers, actors, directors, or the intellectual property on which the project is based.  The presentation of a "package" may convince the studio that the project is sufficiently compelling to justify the studio's risk of financing and producing it.  In addition, as production continues over multiple episodes or seasons, the agency ordinarily will help to provide a "pipeline" of additional talent (e.g., staff writers, actors, mid- and lower-level employees of different kinds) necessary to support a television program's continued production, and provide other ongoing services to aid the success of the program.

8.    "Packaging" became a responsibility of talent agencies, in part, because studios and other production companies in the television industry did not, unlike the major studios in the film industry, develop and foster new talent.  Talent agents and agencies such as CAA stepped into this market to provide this essential and necessary role for television production.  Unlike television studios, talent agencies like CAA spend substantial time and resources searching for and fostering new talent—and then using the agency's leverage with studios to help its clients penetrate the television-production ecosystem that might otherwise be closed to them.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

9.     That the deal is a "package" can be very significant for facilitating the production of television programs.  Since studios want to invest in projects that have the best possible mix of talent, and to have a "pipeline" of talent readily available for a program's continued production, packaging encourages studios and other production companies to invest in, and ultimately produce, television content. Packaging also creates opportunities for writers (including CAA clients) to receive opportunities that they might not receive on their own.  A television studio might perceive an unknown writer's brilliant story idea as too risky if she does not yet have a proven record of successful projects—but combine that writer with a well-established producer, well-known director, stellar cast, and pipeline of talent, and the idea becomes much more attractive.  Even if the "package" initially consists of just a single person and a great idea (e.g., a very powerful showrunner who might individually warrant a "packaging" deal), the studio may find cause for confidence that the agency will continue to serve the packaged project's creative needs in order to ensure their individual client's continued success.  Put simply, packaging gives many CAA clients opportunities they might otherwise never have, and also helps get many television projects made that would otherwise not get off the starting line.

10.     Packaging is particularly important for artists (including writers) in the current media economy, because it helps agencies and their artists secure better deals in an environment in which studios seek relentlessly to reduce the costs of producing television programming, including the amounts paid to talent.

11.     When a CAA project is packaged, none of CAA's clients—including writers and those who may not have been part of the package—pays the standard 10 percent commission that agents otherwise charge their clients.   Instead, CAA receives a "packaging fee," which is typically paid by the production entity that produces the television program.  Thus, packaging arrangements benefit virtually all writers, because instead of paying 10 percent of their compensation to their agents, they keep 100% of that compensation for themselves.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

12.    Sometimes, when programs are profitable enough to generate meaningful "back-end" profits (and these occasions are rare, because the overwhelming majority of programs do not generate back-end profits) a talent agency can earn more from package fees than it would have under a traditional commission system, because agencies will often receive a percentage of the back-end profits as part of the package fee.  But an agency receiving back-end profits does *not* mean that writers (or other talent) do worse.  In fact, packages are generally structured so that the few writers (often, writers who are also acting as producers, such as "showrunners") who might be entitled to share in back-end profits receive more compensation from a profitable packaged program than they would under a commissioning system.  Meanwhile, the overwhelming number of writers (who are employees, not producers, and who are not generally entitled to receive back-end compensation at all, even from profitable programs) almost always do better under a packaging deal than they would have under a commissioning system.  That is because the back-end compensation paid to CAA in packaging deals comes at the expense of the studios, not writers or other talent.

13.    Because most writers receive an economic benefit from packaging, the WGA's assertions that packaging fees are always bad for writers are simply false.

14.    ***Agency-affiliated production.***    Separate from packaging, as an outgrowth of CAA's longstanding work with financiers and independent producers, CAA has also invested in an independent production company, named wiip Productions, LLC ("wiip"), in which CAA now owns, indirectly, an ownership interest.  wiip offers an innovative, talent-friendly alternative to traditional television studios and production companies, and has become an important new competitor in the market for television production.  wiip offers opportunities to CAA's clients, and artists who are not CAA's clients, that might not otherwise exist, and gets entertainment projects made that might otherwise die for lack of independent financing and producers willing to take on riskier projects.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

15.   ***The WGA's power grab.***   The WGA's self-described "power grab" seeks to end both agency packaging and agency-affiliated production—entirely and forever.   The WGA hopes to use its group boycott to prevent CAA and other agencies from receiving packaging fees, in any circumstances whatsoever, and from investing in affiliated content producers or distributors, in any circumstances whatsoever.

16.   That is stunning overreach.   The WGA is attempting to limit competition in a broad swath of commercial markets, such as television packaging and content production, that the WGA has no authority to regulate.   The WGA's efforts to remake the entire entertainment industry extend far beyond any legitimate union or collective-bargaining interest it may hold.

17.   The WGA claims that its group boycott and efforts to restrain competition are justified by the possibility of a "conflict of interest" created by packaging and affiliated production, but this purported justification cannot withstand scrutiny, because the WGA is enforcing its Code of Conduct through group boycott even in circumstances presenting ***no actual*** conflict of interest.   In fact, for more than 42 years, until early April 2019, the WGA ***itself acknowledged and agreed*** that targeted restrictions and ordinary conflict-of-interest rules can protect any of the union's conflict-of-interest concerns, without the far-sweeping and anti-competitive restraint of trade the WGA is attempting to enforce here.

18.   The WGA expressly accepted agency packaging in the Artists' Manager Basic Agreement of 1976 ("AMBA") between the WGA and the Association of Talent Agents ("ATA")[1], the trade industry group for talent agencies (attached hereto as Exhibit A).   The AMBA was sworn and subscribed to by individual talent agencies, including CAA.   The WGA continued to expressly accept agency packaging under the AMBA until April 12, 2019.   Indeed, pursuant to

---

[1] The ATA is the successor to the Artists' Managers Guild, the original signatory to the AMBA.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

"Rider W" of the AMBA, every Agency Representation Agreement with every WGA member writer from September 1976 through April 12, 2019 expressly contemplated and authorized packaging fees, so long as the writer was not required to pay the 10% commission that would otherwise be due under the Agency Representation Agreement. If agency packaging created an invariable conflict of interest substantially harming the WGA's membership, or if the practice was uniformly or generally economically harmful to writers, then the WGA would not have agreed to the AMBA and would have objected to the practice of packaging during the more than 42 years that the AMBA was in effect.

19.     Furthermore, the WGA recognized, from 1976 until April 2019, that there were far less restrictive ways to address any conflicts of interest or specific harms to writers than to ban packaging altogether. Thus, the WGA and talent agencies, including CAA, agreed in the AMBA and Rider W to specific restrictions, tailored to prevent harm from actual conflicts of interest, and directed to actual conflicts if and when they might arise. During negotiations with the WGA in early 2019 related to a proposed renewal of the AMBA, CAA and other talent agencies (through the ATA, with the WGA's permission) offered similar or modified targeted restrictions—directed to actual conflicts of interests if and when they do arise. Any legitimate interest that WGA has in protecting its members against improper conflicts of interest can be accomplished by these kinds of specific, targeted rules.

20.     The WGA now insists that it has an expansive and unprecedented power to use a group boycott to eliminate packaging fees entirely. The WGA has arrogated to itself, based on a supposed "universal conflict of interest" argument, the power to decisively shape the means by which projects are put together and staffed in the entertainment industry as a whole. Even though the WGA's members joined a union that specifically offered its members the choice of participating in packaged deals (a choice that much of its membership accepted) the WGA's leadership has now sought to take the choice of participating in packaged deals away from the

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

8

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

union's membership entirely.  The WGA has knowingly disrupted the lives of thousands of known (and, more importantly, unknown) writers.  It has also disrupted the lives of thousands of non-writers who work in the entertainment industry.  A "power grab" indeed.

21.   ***The WGA's collusion with non-labor parties to enforce its group boycott.***  The WGA has colluded and entered into illegal agreements with non-labor parties—including non-licensed managers and attorneys, "showrunners" acting in their capacity as producers of television programs, and studios and production companies—to enforce its group boycott.

22.   *First*, the WGA has illegally enlisted unlicensed attorneys and managers to assist them in facilitating the group boycott and restraint of trade. Under California's Talent Agencies Act (and under similar laws in New York and other states), only licensed talent agents may procure artistic employment in the film and television industries for writers.  It is flatly illegal for unlicensed artist managers or attorneys to procure a writer's employment in film or television production.  In blatant violation of that law, the WGA has urged unlicensed managers and attorneys to procure employment for WGA members who were clients of agencies, including CAA, that have rejected the WGA's Code of Conduct.  The WGA's illegal encouragement of unlicensed managers to procure artistic employment for writers also demonstrates that the WGA's true concern in attacking agency packaging and agency-affiliated production is not a legitimate concern about conflicts of interest. Unlicensed managers can (and routinely do) produce and own television and film content.  Unlicensed managers routinely receive "back-end" participation from an entertainment project's profits.  But the WGA has not required that these unlicensed managers refrain from such activity in order to (illegally) represent writers in procuring employment.  Again, the WGA's leadership has made clear that its concern is not the well-being of its writer-members.  It is, rather, an institutional power grab.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

23.     Shockingly, the WGA has even offered to indemnify managers and attorneys who violate the law by procuring employment for writers against later legal claims.  The WGA's attempt to coordinate its group boycott in combination with these non-labor groups—up to and including an offer to pay attorneys and managers for illegal conduct to facilitate the group boycott—is a clear and knowing violation of the antitrust laws.

24.     *Second*, the WGA has enlisted "showrunners," acting in their capacity as producers, not writers, to enforce the group boycott.  Showrunners are executive producers, i.e., the effective "CEOs" of television series.  Showrunners are responsible, among other things, for hiring staff writers, staffing other cast and crew, allocating a program's budget, hiring actors (including negotiating contracts with actors), ensuring that the program meets that budget, and exercising near-absolute creative control over television programs.  In these roles, a showrunner is quintessential "management."

25.     While most showrunners are also writers, showrunners predominantly perform functions that have long been recognized by the WGA to be "outside the scope" of its collective-bargaining agreement with studios, and showrunners receive compensation (usually, the bulk of their compensation) for their non-writing work. In fact, showrunners often act not just as managers but as independent entrepreneurs, putting some of their own capital at risk in connection with the production of a television show and sharing in its profits.

26.     Because showrunners acting in their capacity as producers are managers and entrepreneurs, the WGA has no exemption under the antitrust laws for conspiring with non-labor-party showrunners in these circumstances. In addition, the WGA has no legitimate union interest in promoting the anti-competitive, non-writing interests of showrunners in this manner.  A total ban on agency packaging will reduce by 10% the overall compensation that almost all writers will receive for their labor.  The WGA has no legitimate interest in using its coercive power as a

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

10

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1    labor union to reduce or eliminate competition in a separate market for non-writing
2    services (i.e., packaging) when the effects will be to reduce the total compensation
3    that the vast majority of the union's members receive for their writing services.

4    27.    *Third*, the WGA has sought to coerce major studios and production
5    companies to refuse to deal with the agencies who have resisted its group boycott.  It
6    has threatened the studios and production companies if they refuse to assist the
7    WGA with its illegal boycott.

8    28.    ***The remedy sought.***    The WGA's conduct violates Section 1 of the
9    Sherman Act.  This Court should enjoin the WGA's group boycott agreements.  The
10   WGA is also liable for triple the damages that it has caused, and will cause, to CAA
11   as a result of its illegal series of agreements and antitrust violations.  And the WGA
12   must pay CAA's attorneys' fees and costs incurred in bringing this action.  Those
13   are the consequences the law provides for utilizing, as the WGA unfortunately has
14   here, illegal anti-competitive methods in a "power grab."

## II.    PARTIES

16   29.    Plaintiff CAA is a limited liability company existing under the laws of
17   the State of Delaware, with its principal place of business in Los Angeles,
18   California.   CAA is a talent agency that represents some of the world's most
19   successful artists, authors, directors, producers, and entertainers, including writers
20   for television and film productions.   CAA's talent agents are licensed under
21   California law (or, as appropriate, other applicable state laws and other laws).  These
22   laws require that the procurement of employment for writers in the film and
23   television industries be performed by licensed talent agents, not unlicensed
24   managers or entertainment attorneys.

25   30.    Defendant WGAW is a California non-profit corporation headquartered
26   in Los Angeles, California.   WGAW is a labor union representing writers in the
27   motion picture, television, and new media industries.

28

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

11

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

31.    Defendant WGAE is a New York non-profit corporation headquartered in New York City, New York.  WGAE is a labor union also representing writers in the motion picture, television, and new media industries.

32.    WGAW and WGAE work closely together, particularly in connection with the unlawful boycott that gives rise to this action.  Writers who live east of the Mississippi River at the time of their initial membership are enrolled as members of WGAE, whereas those to the west are members of WGAW.

33.    WGAW and WGAE's primary roles are serving as the exclusive collective bargaining representatives for writers with nonparty the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP"), the multi-employer collective bargaining representative for hundreds of motion picture and television producers who employ writers.  The AMPTP represents the parties who are (unlike CAA) writers' actual employers in the entertainment industry.

34.    The WGA and the AMPTP employer-members have operated for many years under a collective bargaining agreement (the Minimum Basic Agreement or "MBA").  Pursuant to the MBA, the WGA is the writers' exclusive collective bargaining representative.  The WGA has designated (or "franchised") licensed talent agents to serve as agents for individual union members in individual negotiations for employment with the production studios (i.e., AMPTP members). The MBA, negotiated by the WGA, sets minimum scales for writers' compensation; however, individual writers use licensed talent agents such as CAA to procure employment and to negotiate the terms of their individual employment deals in excess of those minimum compensation scales and to provide the many other services necessary to start and maintain a writer's career.

35.    The WGA's authority to designate and regulate agents to negotiate terms on behalf of individual writers is limited by the terms of the MBA.  The MBA does not cover the activity of writers when they render services as producers.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

12

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

36.     The WGA's authority is also limited by state regulations (including, but not limited to, California's Talent Agencies Act), which mandate that only talent agents duly licensed under state law are permitted to procure individual employment for writers.

### III.     JURISDICTION AND VENUE

37.     There is subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

38.     This Court has personal jurisdiction over WGAW under 15 U.S.C. § 15 because it resides in this District.  This Court has personal jurisdiction over WGAE because it is a corporation that transacts business in this District.  WGAE performs services on behalf of its members in this District, including but not limited to entering into the Minimum Basic Agreement with AMPTP, which is located in this District; and, in conjunction with WGAW, attempting to negotiate a new AMBA with the ATA, which is also located in this District.

39.     The Court also has personal jurisdiction over both WGAW and WGAE because they are engaged in a group boycott that is directed at, and has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities located in this District, including Plaintiff CAA and its employees.

40.     As to WGAE, its activities in this District are continuous and systematic and purposefully directed towards this District, including at CAA and other talent agencies located in this District, unlicensed artist managers and attorneys located in this District, and the AMPTP, which is located in this District. CAA's claims against WGAE arise in their main part from WGAE's activities in and purposefully directed toward this District.  Accordingly, WGAE is subject to the jurisdiction of a court of general jurisdiction in California, the state in which this District is located, and personal jurisdiction is compelled under California's "long-arm" personal jurisdiction statute and Federal Rule of Civil Procedure 4.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

13

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

41.     Venue is proper in this District under 15 U.S.C. § 15 and 28 U.S.C. §§ 1391(b), (c) and (d), because a substantial part of the events giving rise to the claims for relief stated herein occurred in this District, and because CAA, located in this District, has suffered and will continue to suffer harm in this District from the WGA's actions.

42.     Because Plaintiff CAA and Defendant WGAW both reside in Los Angeles County, this action should be assigned to the Western Division.

## IV.     FACTUAL BACKGROUND

**A.     Packaging Is A Market-Facilitating, Pro-Competitive Means Of Putting Together Television Programs; Eliminating It Will Restrain Competition In Markets Far Beyond The Labor Market For Writers' Services**

43.     CAA, made up of many individual professional agents, invests in its employee-agents to help them to find, nurture, and develop artists' careers, including writers' careers.  More generally, CAA takes on the responsibility of sourcing and discovering artists and stories that could be successful contributions to television programs and other entertainment projects.  This requires an enormous amount of legwork—often unpaid.  CAA agents will routinely represent a writer for years, without pay, before he or she obtains his or her first paying job.  If a writer becomes unemployed, CAA routinely sticks with writer-clients to help them obtain their next paying job (again, a process which can take years).  Providing these services requires a large overhead.  It also requires a large commitment of personnel and professional resources involving many different areas of expertise.

44.     "Packaging" is, in essence, the practice by which CAA brings together some or all of the major creative elements of a potential television program.  Studios and the other entities that produce television programs want a compelling total "package" of talent—actors, directors, writers, and others—to be attached to the project.

45.     CAA helps create opportunities for its clients (as well as creative development between them) by connecting them with one another.  And it is able to

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

14

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

use its "package" of talent as a means of facilitating the actual production of film and television projects, for the benefit of its clients, and indeed for non-clients who share in the benefits of a package. Packaging helps ensure that television programs that would otherwise never get made do, in fact, get produced and distributed to the public.

46.    CAA's services to its clients on a "package" deal generally do not end with the development of a project. CAA also, as part of its services, generally provides from its client base a pipeline of staffing actors, writers, and contributors at middle and minimum-scale levels of compensation that will be necessary over a project's lifespan, particularly in the television industry. This work can be particularly beneficial for CAA clients who are early or mid-career writers. The agency also provides other services that benefit CAA's clients and the overall project.

47.    The ongoing services that CAA may provide to a packaged program are substantial. Representative examples of the work that CAA and its agents may perform on packaged programs include: (a) working with a showrunner on a television program's budget after it is organized for production, including interfacing with a production company or studio and negotiating for an overall higher initial writer budget; (b) providing lists of available writers to help staff the program; (c) helping identify opportunities for actors to work on shows and for decision-makers on shows to become aware of available talent that would contribute to the success of the show; (d) helping to find series and episodic directors; (e) helping a studio negotiate a higher license fee with its broadcaster or a higher imputed license fee when a broadcaster and studio are a single company; (f) research and social media support; (g) publicity and marketing assistance; (h) programming and scheduling assistance and (i) offering to help a studio or production company with off-network sales. Beyond that, if the television program is cancelled by its initial network, CAA agents may assist in helping to set up the

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

15

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

project at a new network or platform.   Finally, CAA agents may assist in the auditing process with respect to "back-end" participation.

48.   Ultimately, the producer of a television program, or its showrunner—not CAA—will determine what elements are accepted as part of the total "package." But CAA will help bring the package together and provide ongoing services to a packaged television program.

49.   Packaging is *not* the means by which CAA's talent agents negotiate the terms and conditions of individual writers' employment and labor services.   Once a package is put together, a writer (or other creative talent that is part of the "package") will almost invariably have a separate employment contract.   This is true whether a writer is a showrunner or an ordinary staff writer.   That separate employment contract, which the writer's agent (ordinarily not the same person within CAA as the packaging agent) will negotiate, governs the terms and conditions of that writer's employment.

50.   As averred above, packaging has existed since at least the 1950s.   For good reason, packaging has become standard in the industry (even as each packaged deal remains different).   It is the *de facto* means of bringing together talent and putting together productions across much of the industry.   In the television industry, almost all major scripted series involve packaging in some form.   Packaging plays a fundamental and critically important role in creating and maintaining a healthy and competitive television industry ecosystem.

51.   Packaging enhances competition.   It is a market-making business model.  It creates economic opportunities for talent and projects alike.   There is clear evidence that studios want the convenience, speed, and long-term commitment that packages provide—if not, packaging would not be the dominant model of bringing together creative talent for television productions.   Absent packaging, there will be longer lead times, friction, and costs involved in greenlighting television programs.

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

16

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

That economic friction will harm the entertainment industry as a whole. It will reduce the output of television shows, particularly scripted television shows.

52.     Accordingly, the importance of packaging extends far beyond the labor market for writers' employment with AMPTP-represented studios, and ending the practice *in toto* would have significant economic impacts far beyond the labor market for writers' employment.  The WGA itself has acknowledged as much.  It admits that the purpose of its group boycott is to end agency packaging arrangements not just for writers, but also for actors, directors, and others.  The WGA has no legitimate labor-union interest in regulating the market for these non-writer artists.

53.     Beyond that, the WGA's actions directly affect the interests of other entertainment industry unions, which have long permitted packaging.  The Directors Guild of America ("DGA") has entered into an agreement which expressly permits agencies to engage in packaging.  The Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") has tacitly permitted the practice for years.  The WGA's group boycott effectively prevents members of these unions— who, in their current arrangements with the ATA, correctly recognize the potential benefits of packaging—from enjoying the benefits of packaging arrangements.

54.     The purpose of the WGA's group boycott and restraint of trade is to eliminate packaging, and the fees that support it, entirely, and to change the rules of the game for the television industry as a whole.  Accordingly, the anticompetitive impact of the WGA group boycott is plainly intended to (and in fact is) a regulation of market competition far beyond the labor market for writers, which is the only market that the WGA is (arguably) entitled to regulate under the labor union exemption to the antitrust laws.

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

17

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**B.** **Agency Packaging Does Not Harm Writers Or Create A Conflict Of Interest**

55.    For its services in bringing together the key creative personnel for a project, i.e., "packaging," CAA generally receives a "packaging fee," paid by the producer, which in television programming is typically a studio, a pay television or streaming video on demand ("SVOD") programming service, or other entity responsible for financing the production.  When CAA provides packaging services on a project, the AMBA and Rider W prescribe that it receives a packaging fee and foregoes the commission (traditionally 10%) that it would otherwise obtain from the compensation earned by any of its clients in connection with the packaged project. Despite the WGA's claims, packaging fees do not—and certainly do not generally— harm writers.  There is no inherent conflict of interest caused by packaging fees, and, as discussed below, industry data demonstrates that packaging benefits most writers.

56.    To be clear, there is no single or standard "packaging" deal that applies in all circumstances.  Each packaging arrangement is separately and openly negotiated by CAA, and CAA's clients and their entertainment attorneys are generally aware of the nature of the individual packaging deal.  Writer-clients of CAA who do not want to participate in packaging deals have always had the right and ability to inform their agents that they do not want to participate in a packaging deal or packaged television program.

57.    Sometimes (but not always) television packages include an upfront license fee, a deferred license fee, and a "back-end" percentage of the profits in the rare circumstances that the television series is profitable.

58.    These terms vary from agency to agency, and deal to deal, in the television industry.  The upfront license fee, for example, is sometimes not a percentage, but instead a fixed base number that studios will pay per episode.  The upfront license fee may vary based upon how a television program will be

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

18

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1  distributed (e.g., basic versus premium cable versus streaming video on demand).  It

2  will also generally vary based on the genre and content of the program.

3       59.    The "deferred" license fee has been paid less often in recent years.

4       60.    The "back-end" percentage based upon a television series' "profits"

5  varies from deal to deal.   The definition of "profits" on which the back-end

6  percentage is calculated also varies widely, depending on revenue definitions, profit-

7  sharing definitions, and other terms that are often separately negotiated in each deal

8  and apply differently in each deal.

9       61.    Importantly, very few television shows are ultimately profitable in the

10  sense that would implicate a "back-end" packaging fee at all (with, again,

11  profitability defined differently in each deal.)  On information and belief, over the

12  past five years, approximately five television shows on major television networks

13  have been sufficiently profitable to invoke "back-end" compensation based on

14  profitability at all.   Historically, on information and belief, fewer than 10% of

15  scripted television series last more than three seasons, which is normally the

16  minimum period necessary to generate meaningful back-end profits.

17       62.    Indeed, forward-looking trends make it likely that the percentage of

18  television programs that generate meaningful back-end profits will drop still further.

19  In recent years, while the number of original scripted television programs has

20  increased, the number of shows that survive through three seasons have not.   In

21  addition, SVOD distributors, such as Netflix, are less likely than the broadcast

22  networks to agree to back-end participation in shows that air on their platforms.

23  That means that, on a percentage basis, even fewer scripted television programs will

24  produce back-end profits sufficient to earn meaningful back-end packaging fees.

25       63.    The WGA claims that *all* packaging deals, in *all* circumstances, create

26  a harmful conflict of interest for agents who represent writers because the agents

27  supposedly will always prioritize the potential (rare as it may be) for a back-end

28  payment over the negotiation of their writer client's compensation, and thus will not

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

19

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

work to maximize writers' pay in a packaged production.  The WGA has also claimed that talent agencies like CAA will always seek to prevent writers from working on projects with talent represented by a competitor agency to avoid splitting the packaging fee; and will always pitch their writer-clients' work to production companies that will pay the highest packaging fee, rather than to production companies that will pay the highest compensation to the client.

64.     The WGA's allegations are false.  CAA's agents (as its writer-clients generally acknowledge) put tremendous effort into ensuring their clients' opportunities and compensation, and holding their clients' interests paramount.  If CAA did not do this, and instead simply as a matter of general practice took steps harmful to its clients' economic interests, CAA would not be able to stay in business in the highly competitive market for talent representation.

65.     More than that, the WGA's positions ignore the overall economics of packaging fees.  As noted above, in the overwhelming majority of cases, scripted television programs do not generate back-end profits *at all*.  In these cases, writers are clearly better off under a packaging fee model, in which the writers do not pay a 10% commission on their employment income, than they would be under a commission model, in which they pay 10% commission on all compensation earned.

66.     This is so because the upfront license fee paid in an agency fee is generally a very small percentage of an actual budget for production of an entertainment  program (generally on the order of 1% of actual show budgets, and almost always less than 3%), and this fee generally does not increase with the number of agency clients in the "package."  That small percentage of the budget devoted to the up-front packaging fee is not, in general, enough to alter or reduce compensation to writers or change production decisions.  For instance, a $1 million television episode may have an up-front fee of $15,000, much less than other indirect production costs, such as studio overhead, catering, and facilities that absorb budget but do not directly contribute to the finished video product.  Thus, in the

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

20

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

overwhelming majority of cases, there is no basis for the WGA's claim that a packaging fee affects the compensation paid by the studio to writers, and, as explained above, the writers take home more compensation in a packaged show because they do not pay the 10% commission for the agency's services.  The benefit of not having to pay the 10% commission is especially clear for staff writers and other lower or mid-career-level writers (i.e., the overwhelming bulk of the WGA's membership) who are brought into a series as part of a "package."  Meanwhile, depending on the number of CAA clients who are packaged in any particular show, and/or their income levels, CAA may earn less from such productions on a packaging-fee model than they would have earned on a more traditional, commission-based model.  (Indeed, given this fact, if CAA were solely interested in its own financial interests and not that of its clients it would attempt to staff as few as possible of its own clients on any given packaging deal, to avoid foregoing commission—but, in the real world, CAA often presents attractive opportunities on packaging deals to its clients).

67.  As noted, programs that do create back-end profits are the exception rather than the norm.  But when these rare events do occur, it is true that such back-end profits can sometimes provide more compensation to CAA under an agency package fee model than CAA would have earned under a traditional commissioning model.  Significantly, however, the possibility that CAA may earn more in a back-end profit situation does *not* mean (and certainly does not mean in general) that writers earn less.  Nor does it mean that the incentives of writers and agents are not aligned.

68.  When CAA receives a percentage of back-end profits in a packaging deal, so, generally, do showrunners and the top tier of writers (along with other important talent).  When both agents and top-tier writers are participating in the "back-end, *both* agents *and* writers' incentives are aligned in trying to ensure that the back-end is significant and as large as possible.  That the agency earns more

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

21

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1    does not mean that showrunners and top-tier writers earn less.

2          69.     The percentage that CAA earns from back-end profits is generally

3    designed to leave showrunners and top-tier writers who have a back-end no worse

4    off than they would have been under a traditional commissioning model, even in

5    situations where CAA benefits from back-end profits.  A generalized example may

6    prove illustrative.   In general, in determining "back-end" participation for both

7    packaging agencies and talent, studios deduct distribution, overhead, and other fees

8    before Modified Adjusted Gross Receipts ("MAGR") are calculated.  Studios then

9    calculate back-end profit percentages for both packaging agencies and talent based

10   on the definition of MAGR for that particular show.  CAA may receive as much as

11   10% of this adjusted number after the (generally sizable) studio deductions.  35% of

12   the remainder is then paid to talent, and 65% retained for the studios.  Therefore, in

13   this case, the agents get 10% of the funds that, in the absence of a packaging fee,

14   would otherwise be shared between the studios (65%) and the talent (35%).  Thus,

15   the economic effect is that the packaging fee represents 6.5% of the studio's share of

16   the split, and 3.5% of the talent's share of the split.  In this circumstance, for a

17   highly profitable show, the agents would indeed receive more from a packaging deal

18   than under a 10% commissioning model.  But, critically, the writers would ***not***

19   receive less.  Because CAA receives 10% of the "split," it receives the 6.5%

20   increase from the studio over what it would have received in a traditional

21   commission structure.  But the talent receives the same amount in either case—35%

22   of 90% of MAGR under an agency-packaging-fee model (or 31.5% of MAGR),

23   versus, under a traditional commissioning model, 35% of 100% of MAGR, less a

24   10% agency commission (or 31.5% of MAGR).  Again, in both cases, the interests

25   of agents and talent are aligned.  In this situation, the effect of eliminating the

26   packaging fee would simply be to allow more money to remain with the studio, not

27   to provide a benefit to the writer.

28         70.     Beyond that, when a program becomes successful enough to generate

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

22

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

back-end profits, a CAA writer-client's deal for such a program is often renegotiated by CAA—often to CAA's own detriment.  This, too, belies the WGA's claim of an inexorable conflict of interest between CAA and its writer-clients.

71.    The WGA's claim that the existence of packaging fees necessarily causes agencies to favor packages only including their own clients is also false.  On information and belief, approximately 50% of the packages that are currently negotiated are multi-agency (i.e., two or more talent agencies share talent and packaging fees).  From a pure numerical perspective, this means that individual agencies, in general, typically negotiate at least as many packages that include talent from other agencies as they do packages that are exclusive to their own clients.  In fact, multi-agency packages are common at CAA, and CAA routinely negotiates for its clients in multi-agency packaging arrangements.

72.    Nor is it true that agencies like CAA will generally pitch programs to studios that pay the highest packaging fee, rather than to production companies that will pay the highest compensation to the client.  As discussed above, this is a false assumption and demonstrates a lack of understanding of the industry structure.  First, packaging often allows CAA to pitch groups of talent to studios in circumstances where an individual writer-client may not have been of interest to a studio in the first place.  Second, and more importantly, there is no reason to believe, given the economics discussed above, that studios in general trade off writer compensation for packaging fees, or that agencies could facilitate studios in doing so.  To the contrary, as noted, up-front fees in packaging deals generally do not affect writer compensation at all, because they are such a small percentage of an overall production budget.  In the rare circumstances when back-end compensation is at issue, as noted, top-tier writers who receive back-end compensation and agents generally have a shared incentive to increase the back-end—both initially and through any additional negotiation that the success of an individual show permits.  Third, it is simply factually untrue that CAA agents pitch programs for their clients

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

23

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

without an eye to their clients' overall compensation or their clients' overall desires. Each deal is different—separate employment for separate creative clients, negotiated by different, individually-responsible agents with different studios.  Each individual client in each individual deal may have different tradeoffs for salary, creative benefit, creative control, etc.  If CAA's agents in fact routinely prioritized packaging fees as opposed to total compensation for their clients, in the fiercely competitive market in which CAA competes it would quickly lose its clients.  That is particularly so since CAA's writer clients are almost uniformly represented by experienced outside entertainment attorneys, all of whom are familiar with the existence of packaging.

73.    In short, there is no systematic or inevitable conflict of interest between writers and agents concerning packaging fees.  As the WGA itself long recognized and authorized, narrowly-tailored rules designed to prevent abuses are amply sufficient to regulate and remedy any issue with packaging fees in the agent-writer relationship.  On these facts, the WGA's claimed "conflict of interest" concern cannot be sufficient to justify regulating, through an antitrust-violating group boycott, a significant portion of the entertainment industry beyond the labor market for writers that the WGA's group boycott seeks to regulate.

### C.    The WGA's Past Practice Confirms That Packaging Does Not Create A General, Inevitable, Or Invariable Conflict Of Interest, And That Any Genuine Conflict-Of-Interest Concerns Can Be Resolved By Rules Targeted At Actual Conflicts

74.    That there is no generalized, inevitable, or invariable conflict of interest between writers and agents concerning packaging fees is confirmed by decades of the WGA's own conduct.  In fact, pursuant to the AMBA, the WGA, and its individual writers (and those writers' attorneys) have for more than 42 years expressly accepted, and benefited from, agency packaging.

75.    The AMBA provided, among other things, that a talent agency that took a package fee would not additionally commission the writers who were part of

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

24

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

the package.  Thus, for more than 42 years, the WGA affirmatively endorsed and consented to agency packaging, expressly recognizing that a chief benefit of being included in a package was freedom from the obligation to pay the agent a commission, as well as the ability to obtain the other benefits created by the agencies' investment in infrastructure to foster and nurture talent.

76.   Indeed, pursuant to "Rider W" of the AMBA, every Agency Representation Agreement with every WGA member-writer from September 1976 through April 12, 2019 expressly contemplated and authorized packaging fees, so long as the writer was not required to pay the 10% commission that would otherwise be due under the Agency Representation Agreement.

77.   The AMBA also contained appropriately targeted rules concerning agency packaging, designed to protect writers from and remedy actual conflicts of interest, while recognizing the substantial benefits to writers from agency packaging.

78.   Significantly, the AMBA prohibited an agency from conditioning its representation of a writer upon his or her agreement to participate in packages. (AMBA, § 6(c)).  It required talent agencies to fund a WGA Negotiator to be available for writers who wanted assistance negotiating package terms.  (AMBA, Ex. N.)  It also included the regulation preventing agents from taking their 10% commissions from writers on projects for which they are receiving any kind of packaging fee.  (AMBA, § 6(c)).

79.   Beyond that, the AMBA required that a talent agent "act with reasonable diligence, care and skill at all times in the interest of his Writer-Client and shall not act against his Writer-Client's interest."  (AMBA, § 8(e)).

80.   The AMBA also included mechanisms for arbitration, in the event a dispute arose between an agent and a writer-client about an agent's breach of the foregoing duties, including in connection with package fees. (AMBA, § 3).  The procedure was very rarely used, an indication of the relative absence of genuine

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

25

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1    conflicts of interest.

2        81.    The 42-year, 1976-2019 AMBA is clear evidence that the WGA did not

3    itself, until very recently, believe that there was a necessary, general, or essential

4    conflict of interest between agents and writers concerning agency packaging.  If all

5    packaging creates conflicts of interest, that would have been just as true between

6    1976 and April 12, 2019, when the WGA expressly authorized agents to charge

7    packaging fees, as today.  But, for all the reasons outlined above, agency packaging

8    does not create such an inherent conflict, which explains the WGA's decades-long

9    approval of the practice.  Instead, as the WGA recognized from 1976 through April

10   12, 2019, tailored rules are appropriate to protect against any actual conflict of

11   interest that might exist in individual cases.

12   **D.**   **Agency-Affiliated Production Through Companies Such As wiip Is Pro-**
         **Competitive And Provides Benefits In Markets Far Beyond The Labor**
13       **Market For Writers' Services; Conflict-Of Interest Concerns Are Easily**
         **Resolved Through Disclosure And Competition**
14

15       82.    CAA is a non-governing shareholder in a recently-founded

16   studio/production company known as wiip Productions, LLC ("wiip").

17       83.    wiip is a new television studio, founded to create new opportunities for

18   writers and other talent in television production.  Its mission is to provide a talent-

19   friendly, transparent environment for the production of television programs, and a

20   competitive alternative to traditional studios.  wiip provides an alternative to the in-

21   house production by television networks that has proliferated in recent decades.

22       84.    wiip helps to get entertainment projects made that would otherwise die

23   on the vine.  In addition, as a talent-friendly alternative to traditional television

24   studios, wiip is often able to offer writers (and other talent) more in pay.  Indeed,

25   WGA itself has conceded that talent agency-affiliates like wiip may pay writers

26   more than traditional studios.  wiip is a signatory to the WGA's MBA.

27       85.    wiip is undoubtedly pro-competitive.  It competes with existing studios

28   to offer new productions, and more opportunity to talent, including writers.  wiip

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2
26
COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

both provides jobs for writers in its own productions and, by competing with existing studios and attracting writers, opens up employment spots for writers in more traditional studios.

86.     Remarkably, the WGA's own leadership has confirmed the importance of agency-affiliated content companies like wiip.  The President of WGAE, Beau Willimon, partnered in 2018 with another agency-affiliated content company. Similarly, Chris Keyser, the current chief negotiator for WGAW, partnered with an agency-affiliated content company in 2019.

87.     CAA owns its interest in wiip Productions, LLC indirectly. wiip is not operated by CAA, nor does CAA have either voting control or authority over wiip.  wiip operates out of separate offices and is headed by a long-time television industry veteran, Paul Lee.

88.     CAA agents do not (and may not) work for wiip.  CAA does not (and may not) share confidential client information with wiip.

89.     Every CAA client involved in any deal with wiip is informed of CAA's role as a shareholder in wiip.  CAA clients involved or potentially involved in transactions involving wiip are encouraged to obtain independent counsel to analyze the potential for a conflict of interest with wiip.  No CAA client enters into a transaction with wiip without having (or having the opportunity to have) independent counsel advise as to a potential conflict of interest created by CAA's investment.

90.     Any potential for a harmful conflict of interest arising out of a CAA writer-client choosing to pursue an opportunity with wiip is eliminated by the series of measures described above.  To the best of CAA's knowledge, no client has actually entered into a transaction with wiip that created an actual conflict of interest.

91.     Beyond that, the potential for a harmful conflict of interest involving wiip is strictly limited, given the intensely competitive market in which talent agents

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

27

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

look for writer-clients, and in which writers hire talent agents.  CAA agents know that if they act contrary to the interests of a writer-client, they can (and likely will) be replaced.  Writers can, and often do, switch agents.  They do so in a marketplace in which agents fiercely compete to acquire writers as clients.  No CAA agent would risk losing a client simply to guide that client to wiip.  To the contrary, wiip is attractive to CAA agents in their roles representing writers only because, and only to the extent, writers might benefit from wiip (notably, because wiip provides a talent-friendly environment that may pay writers, and other talent, more than traditional studios).

92.    Nonetheless, the WGA has now used its group boycott in an effort to drive wiip out of business and to prevent agency investment in these and other entertainment-business entities, regardless of the relationship of these entities to the overall labor market for writer employment, the existence of actual conflicts of interest, and the effect of closure of agency-affiliated production on the entertainment industry as a whole.

**E.    The WGA Embarks On An Effort To Eliminate Agency Packaging Entirely, Regardless Of Its Benefits, And Refuses To Consider Reasonable Conflict-Of-Interest Rules That Would Resolve Any Legitimate Concerns**

93.    In April 2018, the WGA provided a termination notice under the AMBA.  Since then, CAA and other agencies have offered to develop a reasonable modification or update to the AMBA to resolve potential disclosure or conflict of interest concerns.  But the WGA has refused this approach.  The WGA leadership has not negotiated in good faith.  To the contrary, the WGA has indicated over and over again that *even though* individual WGA-member writers benefit from agency packaging and agency-affiliated production in many instances (a fact that the WGA has acknowledged), and *even though* individual writers might choose packaging deals or affiliated production deals to serve their own interests in many circumstances, the WGA is determined to coerce a ban on *all* agency packaging and

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067
603182201.2
28
COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

agency-affiliated content production and distribution, *in toto*.

94.    Following the April 2018 notification, CAA and the ATA offered to meet to discuss a revised AMBA.  The WGA indicated that it would conduct such negotiations with agencies on a joint basis, through the ATA.  But the WGA refused to meet with the ATA's negotiating committee, of which CAA is a member, until February 5, 2019.  In that meeting, and in subsequent meetings, the WGA refused to meaningfully negotiate.

95.    On February 13, 2019, WGAW's President made a speech in which he stated that the union was "making a power grab" intended to "divide and conquer" the agency business, and intended to coerce agents to leave CAA and other major talent agencies.  The speech made clear the WGA's intent.  Regardless of whether writers or others might choose to participate in agency packaging or agency-affiliated production, and regardless of the effect on competition and the overall entertainment industry, the WGA would try to eliminate agency packaging and agency-affiliated production entirely, to increase its "power."  The speech also made clear that the WGA would try to coerce individual agencies, individual agents, and others in order to implement this scheme.

96.    On February 21, 2019, WGA circulated its "Code of Conduct" to CAA and other agencies, indicating that it would insist that CAA and other agencies adhere to the Code of Conduct, at the risk of a boycott by writers.  The Code of Conduct contained a complete ban on agency packaging and agency-affiliated content production and distribution.  Less than two weeks later, on March 4, the WGA publicly declared that negotiations with the ATA had reached an "impasse." The WGA then began to encourage agents at the four largest agencies—including CAA—to quit employment with their agencies and form new companies that would sign the Code of Conduct.

97.    On March 12, 2019, the ATA responded to each WGA proposal with a specific counter-proposal.  Following meetings with hundreds of writer-clients, the

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067
603182201.2
29
COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

ATA presented to the WGA the "Statement of Choice" through which the talent agencies were prepared to commit to a series of tailored agent regulations that would have eliminated any plausibly legitimate WGA concern about packaging. At the same meeting, the ATA proposed regulations to provide for protection against any claimed adverse effects on writers from agency-affiliated production. The WGA summarily rejected the ATA's proposals.

98.    On March 14, 2019, the WGA proposed to the ATA a new "WGA Franchise Agreement," as the successor to the AMBA. The WGA Franchise Agreement was essentially the Code of Conduct, re-purposed as a draft agreement between the WGA and talent agencies. It included complete bans on agency packaging and agency-affiliated production. The WGA further articulated its belief that the guild had decided that all agency packaging and agency-affiliated production must be eliminated, in their entirety. The ATA once again explained that it could not agree to these absolute bans, because such bans would hurt writers as well as actors, directors, producers, and consumers.

99.    On March 21, 2019, the ATA submitted a new comprehensive proposal to the WGA, which included provisions that would preserve the ability of agents to engage in packaging and have a content affiliate, but with tailored regulations and protections to prevent any purported risk of harm to WGA members. Those proposed, tailored regulations are attached hereto as Exhibit B.

100.    Notably, the ATA's proposal included provisions designed to ensure that all writers receive full information to make an informed choice as to whether or not to participate in deals involving agency packaging and agency-affiliated production, as well as other protections against actual conflicts of interest. In general, the ATA's proposal was grounded on a principle of informed choice—that is, writers should be free to agree (or not to agree) to arrangements involving agency packaging and agency-affiliated production based on full information and their own sense of their best interests.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

101.   The proposed targeted regulations offered by the ATA were more than sufficient to resolve any actual, legitimate conflict of interest concerns that might arise with agency packaging or agency-affiliated production.

102.   The WGA, however, summarily rejected the ATA's proposal.  It made clear that it was not interested, at all, in permitting individual writers to choose the option of participating in agency packaging or agency-affiliated production, no matter how beneficial such options might be to an individual writer.  Rather, the WGA would use its "power grab" to eliminate these pro-competitive practices entirely.

**F.   The WGA Implements Its Group Boycott**

103.   From March 27 through March 31, 2019, the WGA called for a vote of its members to adopt the Code of Conduct and to begin enforcing it through a group boycott, following the then-scheduled expiration of the AMBA on April 6.

104.   On March 31, 2019, the WGA announced that its members had voted in favor of the Code of Conduct and agreed to adhere to its terms, as well as the unlawful boycott of CAA and any other agents who did not agree to follow the Code of Conduct.   Following this vote, some last-minute meetings with the ATA continued, but proved futile, given the WGA's ongoing refusal to negotiate in good faith.

105.   On April 13, 2019, the WGA began to implement its group boycott and sought to coerce agencies to sign the Code of Conduct attached hereto as Exhibit C.

106.   The Code of Conduct contains the following provisions, which the WGA is now attempting to implement through its conspiracy and unlawful horizontal group boycott:

> a.   No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any entity or individual

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

engaged in the production or distribution of motion pictures.[2]

    b.    No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any business venture that would create an actual or apparent conflict of interest with Agent's representation of a Writer.

    c.    No Agent shall derive any revenue or other benefit from a Writer's involvement in or employment on a motion picture project, other than a percentage commission based on the Writer's compensation or fee.

    d.    No Agent shall accept any money or thing of value from the employer of a Writer.

*See* Ex. C at 2.

107.    The WGA has expressly told its members that they are prohibited from being represented by an agent who does not agree to the Code of Conduct.  The WGA has informed its members that they ***must*** terminate representation by agencies who do not adhere to the Code of Conduct.

108.    According to the WGA, "No Current WGA member can be represented by an agency that is not franchised by the Guild in accordance with Working Rule 23."  *See* Exhibit D, Agency Code of Conduct Implementation FAQ, at 1.  Working Rule 23, in turn, provides that: "No writer shall enter into a representation agreement whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients."  *Id.*  As the WGA explained, "[a]s of April 13, 2019 that agreement is the WGA Agency Code of Conduct."  *Id.*

109.    The WGA has threatened severe union discipline against any of its members who continue to work with such non-Code-of-Conduct-adhering agencies

---

[2] The term "motion pictures" refers to work written by writers under the Minimum Basic Agreement.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

32

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1   and agents.

2   110.   Expulsion from the WGA is a death sentence for a writer's career.  In

3   other words, WGA members who choose to work with a non-franchised talent agent

4   risk being expelled from the union and having their careers end if they do not join

5   the boycott.   This is because WGA-member showrunners will not hire non-

6   compliant writers, rendering them unemployable.

7   111.   Writers, theoretically, retain an option of turning "Financial Core" (or

8   "Fi-Core").  "Going Fi-Core" means that the writer ceases to be a WGA member,

9   but pays a fee to the WGA to cover the basic costs of representation by the union.  A

10  writer who chooses to "go Fi-Core" could, conceivably, no longer be subject to the

11  burdens of Rule 23 and thus permitted to hire agents, like those at CAA, who have

12  not signed the Code of Conduct.  But the "going Fi-Core" option is not a means of

13  avoiding the coercion of the group boycott—not remotely.  There is a carefully

14  maintained stigma within the industry of not maintaining a WGA membership.  The

15  WGA has in the past published the names of writers who take Fi-Core status and

16  encouraged WGA members not to work with Fi-Core writers.  This threat of a

17  public shaming and boycott are significant to a writer's career, despite the

18  theoretical "Fi-Core" option.   Upon information and belief, no writer who has ever

19  taken Fi-Core status has been subsequently accepted back as a WGA member.

20  Beyond that, a writer who takes Fi-Core status loses the right to vote in WGA

21  elections or run for office in the WGA, effectively eliminating the ability to act as a

22  voice of dissent against current WGA leadership.

23  112.   The WGA has thus, to date, been able to use coercive threats to prevent

24  most writers from using the Fi-Core option to continue working with CAA and other

25  talent agents who have refused to sign the Code of Conduct.

26  113.   On April 22, 2019, at the WGA's behest and due to the coercion

27  implemented by the WGA, thousands of writers, including CAA clients, issued

28  letters terminating their agents.  The WGA delivered what it described as a "first

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

33

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

batch" of more than 7,000 termination letters from individual WGA members to CAA and other talent agencies that refused to accede to the WGA's Code of Conduct.  In a public statement, the WGA indicated that the point of this termination was to "pressure" agencies to "sign the Code of Conduct."

114.   Reports have circulated of worse behavior still.  The WGA provides valuable health care services for its members, and reports have circulated of the WGA and WGA members telling other members that they will lose health care for themselves and their families if they fail to fire their agents.  Put simply, there can be no doubt that the WGA is coercing its members to refuse to deal with CAA unless CAA agrees to the wildly overbroad, anti-competitive provisions of the WGA's Code of Conduct.

115.   The WGA has also unlawfully sought to use its group boycott to break up CAA.  It has encouraged individual agents to leave CAA, and either join agencies that adhere to its Code of Conduct, or set up new talent agencies.  David Goodman, the WGAW's President, has stated that one of the purposes of the group boycott is "to organize key agents to make the move to independence," i.e., to break up existing large agencies.

116.   Through early June, 2019, even as it negotiated in bad faith and took steps to implement its group boycott, the WGA continued to insist on multi-agency negotiations through the ATA.  On Friday, June 7, 2019, for example, representatives of the WGA met with representatives of the ATA, at which meeting the ATA's representatives again proposed reasonable, targeted measures to resolve any legitimate conflict-of-interest or labor concern held by the WGA.  Unsurprisingly, given the WGA's insistence on a "power grab," the WGA refused this offer.  On June 19, 2019, the WGA indicated (for the first time) that it would prefer to "negotiate," if at all, with individual talent agencies even as its unlawful group boycott continued.

117.   On June 27, 2019, the WGA sent a revised version of the Code of

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

34

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

Conduct to CAA, attached hereto as Exhibit E.  In this revised Code of Conduct, the WGA continued to insist on a total ban on agency packaging and agency-affiliated production.  However, the WGA also included two new terms in the revised Code of Conduct.  First, the revised Code of Conduct contained a "Most Favored Nations" provision, which provides that "in the event that after the Effective Date, Guild enters into an agreement with any other agency or association representing agencies containing terms or conditions more favorable to the agency than those contained herein, Agency shall have the option of accepting any or all of the more favorable terms."  The obvious intent of this anticompetitive provision (which, on information and belief, was proposed to other agencies beyond CAA) was to induce smaller talent agencies under pressure from the WGA to agree to participate in the group boycott and unlawful restraint of trade.

118.   Second, the revised Code of Conduct contained a "phase-in" provision, which would allow CAA to continue in packaging arrangements through June 28, 2020.  The presence of this "phase-in" provision utterly belies the WGA's position that packaging fees always or inexorably present a harmful conflict of interest for writers (or even, as the WGA has claimed without any basis in law, are "criminal").  If packaging fees are inexorably harmful to writers (of course, they are not, and actually benefit writers), then the WGA could not possibly agree to their existence for another full calendar year.  Yet that is precisely what the WGA has asked for from CAA.  The WGA's proposal makes clear, once again, that the true purpose of the WGA's unlawful group boycott is not to assist the labor interests of writers.  Nor is the purpose of the group boycott to remedy any legitimate conflict of interest or labor concern.  Instead, the WGA's leadership has made abundantly clear what it wants: a power grab for the sake of a power grab.

## G. The WGA Coerces Talent Agencies—CAA's Direct Competitors—Into Joining the Group Boycott

119.   The WGA, through its actions, is asking talent agencies who are willing

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

to agree to its "Code of Conduct" to participate in the group boycott against the non-signatory talent agencies.

120.   Talent agencies are horizontal competitors who compete with one another, and compete with CAA, to sell their representation services to writers.

121.   To date, approximately forty smaller talent agencies have agreed to the WGA's Code of Conduct and have agreed to participate in the group boycott.  On information and belief, most of these smaller talent agencies faced difficult financial circumstances if they did not comply.

122.    The WGA has coerced these talent agencies to force them to join the group boycott by presenting them with the same coercive choice it has presented to CAA and the larger talent agencies: either agree to the Code of Conduct, or be prohibited from representing any WGA member-writers.

123.   The WGA's coercion of these smaller agencies, and its attempt to coerce other agencies, is an unlawful and anticompetitive horizontal group boycott.

**H. <u>The WGA Induces Managers And Attorneys—Non-Labor Parties—To Break The Law To Join The Group Boycott</u>**

124.   Under California law (as well as applicable law in other states, including New York) licensed talent agents—and only licensed talent agents—are permitted to procure employment in the film and television industries for writers.

125.   As a core component of its group boycott, the WGA has ordered its members to ignore this law, and has sought to induce managers and attorneys to agree to break the law.

126.   Because the WGA's group boycott targets every major talent agency (and thus most talent agents) to achieve its overbroad, unlawful, and anti-competitive ends, the WGA's conduct deprives writers of the only persons (i.e., licensed talent agents) who are permitted under California and New York law to procure employment for writers.

127.   Specifically, on March 20, 2019, the WGA sent an email (described in

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

Exhibit F) to unlicensed managers and attorneys who represent WGA members titled "Limited Delegation of Authority to Negotiate Overscale Terms with Guild-Signatory Companies."  The WGA asserted that, as the exclusive representative for all writers employed under the MBA, it could authorize unlicensed managers and attorneys "to procure employment and negotiate overscale terms and conditions of employment for individual Writers."

128.   In so doing, the WGA was urging managers and attorneys to violate state law.  The WGA has no legal authority to unilaterally waive state licensing requirements, any more than a nurses' union could insist that unlicensed nurses do hospital work.  Its statement to unlicensed managers and attorneys is nothing more than a request that unlicensed managers and attorneys enter into agreements with the WGA (and individual writers) to break the law in order to help enforce the group boycott.

129.   Remarkably, the WGA has gone so far as to promise to ***indemnify*** managers and attorneys who violate the law from financial consequence.  On April 16, 2019, the WGA sent a letter to its members stating that "[t]he Guild has decided … to encourage its members to honor any commitment to pay a talent manager or attorney for procuring or attempting to procure engagements or employment for the writer or for providing other representation notwithstanding any alleged violation of the Act, until further notice from the Guild."   That statement is a frank encouragement to its members to agree with non-licensed managers and attorneys to violate the law.  The letter goes on to state that: "If a talent manager or attorney who provides such procurement services at a writer's direction and in good faith is not otherwise paid for those services because of an alleged violation of the Act, the Guild will reimburse the talent manager or attorney in question for those services." The WGA has unambiguously stated that, in order to induce managers and attorneys to agree to assist the unlawful group boycott, it will indemnify managers and attorneys for engaging in clearly illegal conduct.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

130.   The WGA's actions have the purpose and effect of inducing unlicensed managers and attorneys (who are non-labor parties and not parties to a labor dispute, and for these purposes direct competitors of CAA) to replace CAA and other talent agents, or to force CAA to submit to the WGA's Code of Conduct.

## I.   The WGA Induces Showrunners Acting In Their Capacity As Producers, Not Writers—Non-Labor Parties—To Join The Group Boycott

131.   In recent years, "showrunners" have become powerful in the entertainment industry.  A "showrunner" functions as the effective "CEO" of a television series.  The "showrunner" has ultimate power and control over creative, staffing, and production decisions.  While "showrunners" may perform some writing and/or story services for a series, showrunners also perform extensive services as non-unionized producers, acting well outside of their functions as writers, and well outside of any capacity legitimately regulated by the WGA.

132.   More formally, a "showrunner" is a person in the television industry entitled to receive an "Executive Producer" credit under the rules of the Producer's Guild (a non-union trade association).  Subject only to (a limited, in both formal and practical terms) veto right of the owner of copyright in a program, the showrunner has final responsibility for all creative and business aspects of producing the series.  He or she has direct authority over a majority of the producing functions throughout all phases of the series production, including casting, staffing, budgeting, and marketing.

133.   As a practical matter, while showrunners are generally also writers (and, according to the WGA, WGA members), the bulk of their responsibility is not in "writing" or in acting as a "writer" as defined by the WGA's MBA.  By definition, a showrunner *must* be engaged in an overall supervisory capacity, and undertake significant production responsibilities in addition to his/her writing services and responsibilities.  The showrunner must approve the series budget and production schedule.  He or she must supervise the production, and approve the final

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

cut of each episode.  He or she determines both the creative direction of a program and the personnel who implement that direction.

134.  In his or her capacity as a producer, a showrunner is ultimately responsible for the hiring of personnel who work on the production.  The showrunner hires, or is ultimately responsible for hiring, a series' writing staff.  And the showrunner's hiring responsibilities do not end with writers.  The showrunner also has ultimate responsibility for all other critical hiring responsibilities on the series—hiring all series directors, as well as the casting of all series regulars, key members of the producing team, such as the production manager, director of photography, and composer.

135.  The vast bulk of a showrunner's compensation derives from producing, not writing, services.  Compensation for writing and producing services are often broken out separately, with producing compensation usually more significant.  A showrunner's entitlement to a percentage of a program's profits also generally derives primarily from the showrunner's producing, not writing, services.

136.  Indeed, showrunners often function not only as managers but as entrepreneurs.  Showrunners often own and control their own production companies, which in turn act as independent businesses, with employees, offices, etc.  Those production companies are often used to help produce a television program and ensure its success.  And showrunners are generally compensated with a share of a program's profits (which of course are affected by program's budget, which the showrunners are responsible for helping to create and manage), sometimes even receiving additional compensation if a program comes in under budget.  They take risks, they hire, fire, and supervise workers from the WGA but also other guilds, they manage against budgets, and run individual television program "businesses" from which they personally profit—the hallmark of an entrepreneur.

137.  The WGA's MBA with the AMPTP itself recognizes that when a showrunner is acting in his or her capacity as a producer (but not as a writer), he or

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

39

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

she is performing services "in other capacities which are not subject to this Basic Agreement."  The MBA does not regulate the compensation showrunners obtain in their capacity as producers for non-writing services.  The WGA has no legitimate labor interest in the maintenance of wages for producers' non-writing services.

138.  Thus, showrunners are plainly "management."  They are not "employees" under the National Labor Relations Act ("NLRA").  Their compensation in general, and particularly as producers for non-writing services, is not a mandatory subject for bargaining under the NLRA.  There is no federal policy requiring an employer to collectively bargain for wages in fields outside the scope of mandatory subjects of bargaining under the NLRA.

139.  Accordingly, in their capacity as management-level producers and entrepreneurs, showrunners are non-labor parties for the purpose of the labor exemption to the antitrust laws.

140.  Additionally and alternatively, showrunners' compensation for non-writing producer services is beyond the scope of the MBA.  Accordingly, the WGA does not have a legitimate interest in regulating showrunners' compensation for non-writing producer services.

141.  Nonetheless, the WGA's group boycott includes showrunners and other WGA members when acting in their capacity as producers.  The WGA has specifically instructed its membership that writers who also act as producers must fire their agents for both services, and cannot continue to be represented by an agent for purposes of producing only.  See Agency Code of Conduct Implementation FAQ, attached hereto as Exhibit D ("What if I'm a TV writer/producer? Some unsigned agencies have been telling clients they can still represent them as producers.  This isn't true.  Because your writer and producer functions are inextricably linked, and are deemed covered writing services under the MBA, you cannot continue to be represented as a producer by an agency not signed to the Code of Conduct.").

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

40

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**J.** <u>**The WGA Attempts To Coerce AMPTP Members—Non-Labor Parties—to Join the Group Boycott**</u>

142. The WGA has also sought to coerce the AMPTP, a non-labor party for this purpose, to join the group boycott.

143. The AMPTP is comprised of producers of television and film entertainment. Those producers compete with wiip, which also produces television and film entertainment, and are thus horizontal competitors of wiip as well as other producers.

144. The WGA's collective bargaining agreement with AMPTP—the MBA—is effective through May 1, 2020. It does not require AMPTP members to negotiate only with agents that are designated (or "franchised") by the WGA.

145. On February 9, 2019, the WGA sought to change this by requesting that the AMPTP agree to add a clause to the MBA that would prohibit AMPTP members from doing business with any talent agency that does not agree to the WGA's Code of Conduct.

146. Upon information and belief, at the very same meeting, the WGA also demanded that the AMPTP agree to the following amendment (in bold/underscored text) to the MBA:

> ARTICLE 9 – MINIMUM TERMS (GENERAL)
>
> The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8. **<u>Unless conducted by an individual writer without assistance of any other person, such negotiations may be conducted or assisted only by agents who, at the time of such negotiations, are bound to an agreement with the Guild concerning the terms of such representation or are otherwise certified by the Guild to assist with or to conduct such negotiations.</u>** The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

ARTICLE 3 – WORK LISTS, LOAN-OUTS AND RECOGNITION

…

B.  RECOGNITION (THEATRICAL)

1.  The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining for all writers in the motion picture industry, **except that an individual writer may designate an agent to negotiate on his or her behalf, or to assist him or her in the negotiation of better terms than are here provided, provided that such agent is, at the time of such negotiations, bound to an agreement with the Guild concerning the terms of such representation or is otherwise certified by the Guild.**

147.  To date, the AMPTP has not acceded to the additional clause in the MBA requested by the WGA.  Nonetheless, on information and belief, the WGA's attempt at coercion of the AMPTP and its members continues, and the WGA's leadership has made clear that it will continue to attempt to coerce the AMPTP and its members into participating in or supporting the group boycott.

## V.  FIRST CLAIM FOR RELIEF: VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)

148.  CAA incorporates by reference and re-alleges all previous paragraphs as if fully set forth herein.

149.  The Sherman Act prohibits agreements that unreasonably restrict competition.  Group boycotts and concerted refusals to deal, like the WGA conspiracy challenged here, are *per se* illegal.

150.  There can be little doubt that the WGA's conduct and its group boycott violate the Sherman Act, unless the WGA is somehow exempted from the Sherman Act because of its status as a labor union.  But the WGA, on the facts here, is not exempt from the antitrust laws under any union-labor exemption.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

### A. __The WGA Cannot Rely On The Limited Statutory Labor Exemption to the Antitrust Laws__

151.   Labor law gives labor unions a limited right to exercise monopoly power over the labor market for their members' services.  That monopoly exists to facilitate collective bargaining, i.e., to grant unions the exclusive authority to negotiate with employers over the terms and conditions of the union members' employment.  But precisely because that monopoly is so powerful, it is subject to only a limited exemption from the antitrust laws.

152.   Congress created a statutory labor exemption to shield from antitrust scrutiny certain union activity that is in pursuit of *legitimate* labor union goals. Without that exemption, most union activity would constitute an unreasonable restraint on trade and an antitrust violation.  But this statutory exemption does not confer a blank-check immunity from the antitrust laws for all union conduct.

153.   Rather, for the statutory labor exemption to apply, a union (i) must not be acting in concert with non-labor groups *and* (ii) must be confining its concerted action to the accomplishment of a *legitimate* union interest.

154.   Here, the WGA fails both tests.

155.   Clearly, the WGA's group boycott is being conducted in conjunction with one or more non-labor groups.  Therefore, the statutory labor exemption does not apply on this ground alone.

(a)     First, the WGA has induced non-licensed managers and attorneys to assist it with the group boycott.  In order to obtain their help with the boycott, the union has offered to indemnify non-licensed managers and attorneys against violations of state law.  The union has urged them to take the place of agents in procuring employment for the union's members, even though that is prohibited by state law.  To the extent that non-licensed managers and attorneys follow the WGA's urging that they procure employment for talent, these managers and attorneys would be competing in the same market as

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

43

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

CAA—the market for procuring employment services for clients—to a sufficient degree that they would be capable of committing an antitrust violation against CAA regardless of the union's involvement.

(b)     Second, showrunners acting in their capacity as producers are a non-labor group.  Showrunners acting in their capacity as producers are not represented by the WGA, which has no power to represent producers as such. Beyond that, showrunners are not "employees" subject to the ordinary protections of the NLRA.  They act as employers themselves; they affirmatively hire and fire writers, and have extensive responsibility for production, budget, and many other decisions. When showrunners act as producers, they serve, in effect, as employers, supervisors, managers, and/or entrepreneurs in connection with the production of television programs.  And showrunners (acting as producers and hirers of talent) could potentially operate in the same market as CAA to a sufficient degree that they would be capable of committing an antitrust violation against CAA regardless of the union's involvement.

(b)     Third, the AMPTP and its members are non-labor groups.  The AMPTP's members (who compete with wiip directly and who bargain with CAA and other agencies over the amount of package fees) compete with CAA to a sufficient degree that they would be capable of committing an antitrust violation against CAA, independent of the union's involvement.

156.   Even if, however, the WGA were not acting in combination with one or more non-labor groups, it still would not be entitled to protection under the statutory labor exemption.  A group boycott to enforce prohibitions against agency packaging and agency-affiliated production *in toto* exceeds any lawful union interest.

157.   Whatever legitimacy there may be to a concern about conflicts of interest in agency packaging and agency-affiliated production, the WGA's boycott far oversteps the legitimate scope of any such concerns.  The WGA's group boycott

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

44

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

seeks to *entirely* ban agency packaging and agency-affiliated production, *without* regard to the existence of any actual harm to writers' interests.  The WGA seeks this total ban even though (as alleged above) agency packaging *benefits* the interests of most writers.   The WGA seeks this total ban even though a ban on agency packaging would have impacts far beyond the labor market for writers, and would fundamentally transform an important part of the entertainment industry, affecting writers, directors, actors, and non-writer producers.  The WGA seeks this total ban even though agency-affiliated production creates opportunities for writers, and enhances competition in the entertainment industry as a whole.

158.   In fact, a genuine concern about legitimate "conflicts of interest" is not the true motive for the WGA's group boycott.  The WGA's true concern in seeking to ban agency packaging cannot be a genuine belief in a generalized "conflict of interest," when (a) agency packaging generally benefits writers;  (b) the WGA itself expressly accepted and endorsed agency packaging as a general practice for more than 42 years prior to April 2019, with full knowledge of the purported "conflict," and indeed incorporated into every contract between a member and an agent the potential for agent compensation via a packaging fee; and (c) the WGA used tailored rules to guard against a purported conflict of interest, including a specific requirement that that agents not act against their clients' interests, for more than 42 years without identifying some form of conflict-of-interest crisis, but flatly rejected any attempt to update such tailored rules in recent months.

159.   Rather, the WGA's true motive has been expressly acknowledged by WGAW's President, who has admitted that the WGA is engaged in a "power grab," designed to increase the institutional power of the WGA by anti-competitively hurting talent agencies and reshaping a significant portion of the entertainment industry, whatever the cost to individual writers or to others in the industry.

160.   Nor is the effect of the WGA's group boycott to reasonably solve a legitimate conflict of interest problem.  As shown above, there is *not* a general

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

45

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

conflict between agency packaging or agency-affiliated production and writers' interests.  There is certainly not one that justifies the WGA's actions here in seeking to ban agency packaging and agency affiliated-packaging entirely.   A genuine conflict of interest issue could be solved by creating rules addressed to that conflict of interest.  But that is precisely the approach the WGA has rejected.

161.   The WGA's actions cannot be justified as a means of supporting wages in the labor market for writers, because the WGA's group boycott actually has the perverse effect of ***reducing the overall compensation*** that most writers, and the bulk of the union's membership receive for their writing services, i.e., the opposite of a legitimate union interest.  There is no federal policy under which a union could be permitted to regulate a market far beyond the labor market it is authorized to regulate, at the cost of reducing compensation received by the bulk of its working membership, simply to control another market (i.e., packaging) that the union does not have authority to regulate.  Beyond that, there is no federal policy protecting collective-bargaining rights for managers like showrunners at all—let alone a federal policy sufficiently strong to justify interference with the antitrust laws.

162.   The WGA also has no legitimate WGA-union interest in denying the benefits of agency packaging and agency-affiliated production to actors, directors, non-writer producers, and many others that it does not represent as part of the WGA's bargaining unit.  Regulating the job opportunities and compensation of these persons is not a legitimate union interest.

163.   Beyond that, among the primary beneficiaries, as alleged above, of the WGA's attempt to eliminate agency packaging and agency-affiliated production are ***the AMPTP and its members***—i.e., the non-labor parties that employ the WGA's members and actually pay packaging fees to the talent agencies.  The AMPTP members would obviously benefit from the elimination of competition from agency-affiliated studios, like wiip.  In addition, the AMPTP and its members, as discussed above, would receive a potential benefit from the elimination of agency packaging

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

(even as efficiency and production in the industry as a whole, and most writers, would lose from the elimination of the practice), because studios could potentially keep some or all of the packaging fees the studios now pay for the work that agents do in bringing together the talent and intellectual property necessary to create a new television program. If agencies were forced out of the packaging business by the WGA's group boycott, AMPTP members could potentially move some of the packaging function in-house and simply keep any package-fee savings for themselves. This would decrease efficiency and production in the market as a whole, but might benefit some individual AMPTP members. Benefitting an employer, while hurting union members, in the service of a transformation of the entertainment industry far removed from the labor market for writers' services simply is not a legitimate union interest that would support application of the statutory labor exemption.

164. The WGA's boycott to eliminate agency packaging and agency-affiliated production also does not concern the terms and conditions of employment for union members—another reason the statutory labor exemption does not apply. Banning agency packaging does not directly affect union member compensation from the AMPTP (because it impacts fees paid by studios to agencies, not compensation paid by studios to member-writers). The ban on agency packaging also does not directly affect the terms and conditions of employment of union members, since the member-employees are hired pursuant to separate employment contracts independent of agency packaging deals. And, in any event, packaging agreements do not include any terms affecting the terms and conditions of individual writers' employment.

165. Nor does the WGA's conduct resemble traditional union activity—another factor courts consider in determining whether union activity is "legitimate" so as to invoke the labor antitrust exemption. The WGA's activity here does not resemble, in scope, scale, or method, the traditional labor-union methods that courts

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

have protected from application of the antitrust laws.  The WGA's campaign to eliminate packaging, and the fees that support it, as well as agency-affiliated production, affects commercial markets far beyond writer employment, and thus is not traditional union activity.  Providing encouragement to unlicensed managers and attorneys to break the law in violation of California and other state laws is not traditional union activity.  Enlisting showrunners acting in their capacity as employers/producers to join the group boycott is not traditional union activity.  The threats against AMPTP members if they do not join the boycott are not traditional union activity.

166.   In sum, there is no legitimate union interest for the WGA to orchestrate a group boycott to restrict competition in commercial markets that it has no labor law authority to regulate, and that benefits non-labor parties.

167.   Accordingly, the statutory labor exemption does not apply.

**B. The Non-Statutory Labor Exemption Also Does Not Apply**

168.   In addition to the "statutory" labor exemption, courts have created an additional labor exemption from the antitrust laws, known as the "non-statutory exemption," in areas where courts have deemed the exemption necessary to the proper functioning of the collective bargaining laws.  Like the statutory labor exemption, the non-statutory labor exemption is strictly limited.

169.   The purpose of the non-statutory labor exemption is to provide unions and employers with the ability to bargain over wages, hours, and working conditions (the mandatory subjects of collective bargaining).  But this is not what the Code of Conduct addresses.  Agency packaging and agency-affiliated production are not mandatory subjects of collective bargaining.  They are not part of the collective bargaining process.  For that reason alone, the non-statutory labor exemption does not apply.

170.   Courts sometimes consider other factors as tests to help determine whether to apply the non-statutory labor exemption.  Under each of these factors,

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

48

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1   the WGA's conduct cannot support invoking the non-statutory labor exemption.

2       (a)   ***Whether the conduct has been traditionally regulated under labor law***

3   ***principles, or raises subjects that are suitable for resolution as a matter of***

4   ***labor law.***   The markets for agency packaging and agency-affiliated

5   production have not traditionally been regulated by labor law, because they

6   are not traditional labor markets at all.

7       (b)   ***Whether the restraint on trade primarily impacts only the parties to a***

8   ***collective bargaining agreement and no one else***.   Here, the WGA's conduct

9   plainly impacts thousands of people who are not WGA members and not

10   parties to the WGA's collective bargaining agreement, including directors,

11   actors, producers (including WGA members who serve as producers) and

12   others, including studios, agents, and the public for a large number of

13   television programs.

14       (c)   ***Whether the restraint on trade affects business markets, and if so,***

15   ***whether the restraint does so directly.***   Here, the WGA's conduct affects a

16   very substantial portion of the entertainment industry, far beyond the

17   employment interests of writers, and does so directly.

18       (d)   ***The presence of less restrictive means.***   As discussed above, there are

19   numerous less restrictive means to achieve any legitimate union goals,

20   including the rules implemented under the AMBA for over 42 years, and

21   those proposed by CAA and the ATA in recent negotiations.  And in general

22   it is clear that the total ban sought by the WGA is not the least restrictive

23   means of achieving its goals.   As shown above, in many, if not most,

24   individual instances, a writer's net compensation will be higher due to being

25   part of a package, because the writer does not have to pay a 10% commission;

26   yet the WGA's total ban would entirely eliminate that benefit that is currently

27   enjoyed by many of its members.  Eliminating agency-affiliated production is

28   clearly overbroad because it will eliminate potential jobs for writers (and

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

many others) entirely. Additionally, the WGA itself has made clear that its bans on agency packaging and agency-affiliated production are not the least restrictive means of achieving any of its goals, because it has **not** required the unlicensed managers and attorneys whom it has encouraged to break the law to assist in the group boycott to join in its "Code of Conduct"—even though such attorneys and managers do not have limitations on the fees that they can charge, and can attach themselves to projects as producers, i.e., the very "conflicts" from which the WGA is supposedly trying to protect its members.

171. Accordingly, the WGA's anticompetitive Code of Conduct and group boycott are not entitled to the protection of the non-statutory labor exemption.

## C. The WGA's Group Boycott is a *Per Se* Violation of Section 1 of the Sherman Act

172. Because no exemption from the antitrust laws apply, the WGA's group boycott and concerted refusal to deal is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

173. A Section 1 claim requires a contract, combination, or conspiracy in restraint of trade or commerce. Here, the WGA has orchestrated a series of such agreements as part of its overall conspiracy. Without limitation:

(a) Under the instruction and coercion of the WGA (that is, WGAE and WGAW, acting in concert and agreement), a majority of the WGA's members, who themselves compete with one another to hire the services of talent agents, have entered into an unlawful horizontal agreement to boycott and refuse to deal with talent agencies, unless the agencies adopt the WGA's "Code of Conduct." The WGA has threatened severe disciplinary action against writers (up to, and including, career-ending expulsion from the union) unless the writers agree to participate in the boycott and group refusal to deal, and has threatened public shaming and reduced ability to find work on writers who attempt to opt out of the group boycott and refuse to deal by taking "Fi-

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Core" status.

(b)     The WGA has encouraged certain other talent agencies who are CAA's direct competitors to sign the Code of Conduct, operating as a horizontal agreement to boycott non-complying agencies like CAA, to the direct, anticompetitive benefit of such other agencies, who are CAA's competitors.

(c)     The WGA has induced showrunners, when acting in their capacity as non-writing producers, to boycott non-complying agencies like CAA, operating as a horizontal agreement to boycott agencies like CAA, to the detriment of CAA.

(d)     The WGA has attempted to induce and has induced, including through promises of indemnification for breaking the law, unlicensed managers and attorneys to procure employment for its members, in order to achieve the ends of the group boycott and harm non-complying talent agencies like CAA.

(e)     The WGA has attempted to induce the AMPTP to join and assist the WGA in orchestrating its unlawful group boycott.

174.   These kinds of contracts, combinations, and conspiracy amongst horizontal competitors to boycott and refusal to deal are *per se* violations of Section 1 of the Sherman Act.

**D. The WGA's Group Boycott Also Is An Unlawful Restraint Of Trade Under Either A "Quick Look" or Full Rule-of-Reason Antitrust Analysis**

175.   If the Court were to decline to apply a *per se* test, the WGA's conduct still clearly constitutes an illegal restraint of trade in violation of Section 1 of the Sherman Act.

176.   Under a rule-of-reason analysis, the Court weighs the anticompetitive harm caused by the WGA's restrictions against the potential pro-competitive benefit of those same restrictions.  Here, the anticompetitive harm is obvious, and there are

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1    no pro-competitive benefits.

2        177.   The rule-of-reason analysis also includes defining the relevant

3    economic market(s) in which the WGA is restraining competition, assessing the

4    WGA's market power in these markets, considering whether the WGA could

5    achieve any ostensible pro-competitive benefit in a less restrictive manner, and, if

6    necessary, balancing the anti- and pro-competitive effects against one another.

7        178.    As an alternative to a full rule-of-reason analysis, the Court could also

8    conduct a "quick look" review of the WGA's conduct to determine whether it

9    clearly constitutes an unlawful restraint of trade because of its clear horizontal

10   anticompetitive impact on competition and lack of any plausible justification (e.g.,

11   without the need to define the relevant economic markets or assess the WGA's

12   market power).

13       179.   Regardless of whether a "quick look" or "full" rule-of-reason analysis

14   is applied, the WGA's anticompetitive agreements clearly violate Section 1 of the

15   Sherman Act.

16       180.   ***Markets and market power***.  CAA and other talent agencies compete in

17   a market to sell their representation services to writers negotiating with producers

18   who are members of the AMPTP.  In addition, writers compete with each other to

19   acquire the representation services of agents.  The geographic scope of this relevant

20   market is the United States.  There are no substitutes for the representation services

21   (or cross-elasticity of demand) provided in this market, because under California

22   (and New York, and other relevant state) laws, only licensed talent agents may

23   procure employment in the television industry for writers.  The WGA has stifled

24   competition in this relevant market through its group boycott.

25       181.   The WGA has not only market power, but also a full monopoly over

26   the relevant market.  This is because of WGA's status as the exclusive collective

27   bargaining representative of all writers for television production companies that are

28   AMPTP members (i.e., every Hollywood studio).

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

182.  Another relevant market is the market to produce and distribute scripted television shows.[3] There are no close substitutes or cross-elasticity of demand with producers of other forms of entertainment (e.g., sports or theater or the opera) because these forms of entertainment do not have the unique qualities of scripted television, and workers in those "entertainment" industries lack experience, talent, reputation or motivation to produce television shows.  The geographic scope of this market is the United States—the dominant market for television production.

183.  The WGA's ban on agency packaging unreasonably restrains competition in the market for the development and production of scripted television shows.   As pled above, packaging is a critical component of the market for television production.   By leveraging monopoly power in the labor market for writers to eliminate the agencies as competitors for packaging, the WGA is unreasonably restraining competition in that market.   Writers are essential components of packages, and most television programming is packaged.   The anticompetitive effects are substantial—indeed, enormous—because many (or all) agents will be driven out of packaging if the WGA's conspiracy and group boycott succeed, transforming a significant market in the entertainment industry.

184.  The WGA's ban on agency-affiliated production also unreasonably restrains competition in the market for the development and production of scripted television shows.   The WGA has leveraged its monopoly power in the labor market for writers to eliminate agency-affiliates such as wiip as competitors with the established studios in the relevant market for television production.   The WGA's group boycott to eliminate new entrants in the market has significant anticompetitive effects.   To the extent that studios are participating in this boycott, they directly benefit from the reduction in competition.

---

[3] Alternatively, the production of films and the production of television shows may either constitute separate relevant markets or sub-markets of the relevant market for film and television production.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

185.  The WGA's group boycott also further unreasonably restrains competition in the market to represent writers by providing an anticompetitive advantage to unlicensed managers and attorneys who are being asked to replace the boycotted agents.  The WGA has not required that these unlicensed managers and attorneys refrain from participation in packaging and content production.  In fact, the WGA has knowingly allowed unlicensed managers to produce and own television and film content for decades.

186.  *No pro-competitive justifications.*  There is no pro-competitive justification for completely banning agency packaging and agency-affiliated content production and distribution.

187.  Here, the only competitive effect of the challenged restraint is to eliminate agencies who refuse to sign the Code of Conduct (including CAA) as competitors in the relevant markets.  These restraints on their face reduce—not enhance—competition.

188.  Even if there were pro-competitive effects, the WGA could achieve any pro-competitive objective through far less restrictive alternatives than an absolute ban on agency packaging and agency-affiliated production.

189.  If the Court were to "balance" harms under the final step of a rule-of-reason analysis, the WGA's conduct would fail this step as well.  Complete bans on agency packaging and agency-affiliated production cause significant anticompetitive effects in the relevant markets with no offsetting pro-competitive benefit at all.

190.  *Antitrust injury.*  CAA has suffered and will continue to suffer antitrust injury to its business and property as a direct and proximate result of the WGA's unlawful conspiracy.

191.  Because of the WGA's group boycott and refusal to deal, and instruction to its members to fire their agents, CAA has already lost a substantial number of clients and work.  CAA has and will continue to lose work, lose clients, lose packaging fees, and suffer irreparable harm to its business and property as a

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

54

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

result of the WGA's unlawful conspiracy.  CAA's clients have also been damaged by the WGA's actions, through loss of current and future income.

192.    Consumers of television will also be injured by the reduction in television output caused by the WGA's conspiracy.

193.    CAA will prove the amount of damages it has suffered as a result of the WGA's antitrust violation at trial.

194.   CAA is entitled to both treble damages for the antitrust violations, and attorneys' fees.

## PRAYER FOR RELIEF

CAA respectfully requests that the Court enter a judgment against the WGA as follows:

1.    Declaring that the WGA's bans on agency packaging and agency-affiliated production, concerted refusal to deal, and group boycott to enforce these prohibitions constitute an illegal contract, combination, or conspiracy constituting an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.    Permanently enjoining the challenged conduct;

3.    Awarding CAA treble damages, as well as costs and attorneys' fees, in an amount to be proven at trial;

4.    Awarding pre- and post-judgment interest at the maximum rate allowable by the law; and

5.    Ordering such other relief as the Court may deem just and equitable.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603182201.2

55

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1  DATED:  July 1, 2019          KENDALL BRILL & KELLY LLP

2

3

4                               By: _____
                                    Richard B. Kendall
5                                   Attorneys for Creative Artists Agency,
6                                   LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff CAA demands a trial by jury of all issues so triable.

DATED:  July 1, 2019                                        KENDALL BRILL & KELLY LLP


By: _____

Richard B. Kendall
Attorneys for Creative Artists Agency,
LLC

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT